OLIVER W. WANGER, Bar No. 40331
Wanger Jones Helsley PC
265 E. River Park Circle, Suite 310
P.O. Box 28340
Fresno, CA 93729
Telephone: (559) 233-4800
Fax: (559) 233-9330
owanger@wjhattorneys.com

MARC DAYS, Bar No. 184098
Days Law Firm
1107 R Street
Fresno, CA 93721
Telephone: (559) 708-4844
Fax: (559) 486-1826
marcdays@dayslawfirm.com

JOHN BALAZS, Bar No. 157287
Attorney at Law
916 2nd Street, Suite F
Sacramento, CA 95814
Telephone: (916) 447-9299
Fax: (916) 557-1118
balazslaw@gmail.com

Attorneys for Defendant
DENNIS FALASCHI

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DENNIS FALASCHI,<br><br>Defendant. | No.  1:22-CR-00103-JLT<br><br>**Defendant Dennis Falaschi's Motion to Dismiss Counts 1 and 2**<br><br>Motion Hearing:<br>Date:  January 23, 2023<br>Time: 10:00 a.m.<br>Hon. Jennifer L. Thurston |

## I.     Introduction

Defendant Dennis Falaschi, through counsel, moves to dismiss counts 1 and 2 on the ground that the water discharges charged in the indictment were seepages that Panoche Water District (PWD) was authorized to use pursuant to PWD's contracts with the Bureau of Reclamation (Bureau).  Thus, there was no theft as a matter of law.  It appears that this direct exculpatory evidence--PWD's contracts with the Bureau authorizing use of seepage--was never presented to the grand jury.

The indictment alleges water from the DMC was "leaking" through a drain into a farmer's standpipe, was added to PWD's water supply, and then sold by PWD to farmers.  ECF No. 1, ¶¶ 12-13.  As discussed further below, according to the indictment, the average annual amount of water leaking from the DMC into the standpipe consisted of approximately .25% (1/4 of 1%) of the water flowing through the DMC annually.  *Id*. at ¶¶ 6, 9, &16.

The DMC water that leaked into the standpipe and was added to PWD's water supply was seepage.  Seepage has been defined as:  "The loss of water from a watercourse or a body of water, natural or artificial, by its slow movement through the ground or wall of the reservoir." *Ballentine's Law Dictionary*, (3rd ed. 2010).

According to the indictment, PWD used and sold the seepage, not Mr. Falaschi.  ECF No. 1, ¶ 14.  The allegation in the indictment that Mr. Falaschi, the General Manager of PWD for 30 years, paid himself an exorbitant salary is false, easily determined from public records, and was erroneously presented to the grand jury; in fact, Mr. Falaschi was paid significantly less than comparable general managers.  *Id*. at ¶ 17.[1]  Mr. Falaschi was never paid for any PWD water.[2]

---

[1] The following is a table of Special District General Manager salaries that are publicly available:

| Entity | 2012 Total Pay | 2013 Total Pay | 2014 Total Pay | 2015 Total Pay |
|---|---|---|---|---|
| GM Panoche Water District (Mr. Falaschi) | $176,313 | $207,792 | $203,478 | $203,557 |
| GM San Luis Water District | $223,159 | $238,741 | N/A | $182,941 |
| GM San Luis Delta Mendota Water Authority | $238,179 | $248,311 | N/A | $250,991 |
| GM Westlands Water District | $376,032 | $376,032 | $376,032 | $350,318 |

[2] It is highly relevant that the government obtained millions of dollars from PWD, the responsible party, for water that is the subject of the indictment.  Attached as **Exhibit A**, is a

To the extent the government contests the facts underlying this motion, Mr. Falaschi requests an evidentiary hearing.

## II.    Statement of Facts

### A.    Background

The Panoche Water District, or Public Water District-1 (PWD) as it is referred to in the indictment, is a state special district established to provide water to over 38,000 acres of farmland in Fresno and Merced counties.  ECF No. 1, ¶ 2.  Mr. Falaschi worked as the general manager for PWD.  *Id.*, ¶ 1.  Among other sources, PWD contracted to purchase water from the Bureau of Reclamation's Central Valley Project.  *Id.*, ¶ 5.  The Central Valley Project obtains water from different sources and pumps that water south through the Delta-Mendota Canal (DMC) to PWD and other water districts.  *Id.*  The Canal was built in the 1950s and is approximately 117 miles long, nearly 2,000,000 acre-feet pass through it each year.  *Id.*, ¶ 6.

The water purchased by PWD from the Bureau of Reclamation was combined with water from other sources and moved around the district through a series of smaller canals, pipelines, pump facilities, and other facilities that PWD operated.  *Id.*, ¶ 8.  PWD paid the Bureau a set price for each acre-foot of water it received based on its contracts with the agency.  *Id.*, ¶ 7.  PWD generally did not store water because it had minimal capacity to do so.  *Id.*, ¶ 8.

---

Settlement Agreement between the United States of America and Panoche Water District.  On January 15, 2021, without admitting liability, PWD entered into a Settlement Agreement with the government to settle the government's claims against PWD.  *Id.* at pgs. 2 and 18 of 23.  Under threat of debarment or suspension, including termination of its water contract with the Bureau, PWD agreed to pay the government $7,462,808.  *Id.* at ¶¶ 1 & 7.  As consideration for the Settlement Agreement and conditioned upon PWD's timely payment, the Bureau agreed, among other things: (1) to not seek exclusion, debarment, or suspension on account of the DMC water that is the subject of the indictment; (2) to not preclude PWD from receiving the benefits of its current or a renewed water contracts on account of the DMC water that is the subject of the indictment; and (3) to not preclude PWD from seeking to enter into agreements, relating to the provision of drainage service under the San Luis Act, or applying for any grants, assistance agreements, or cooperative agreements.  *Id.* at ¶ 7; *see also* 2 CFR §§180.700 (When may the suspending official issue a suspension) and 2 CFR 180.800 (What are the causes for debarment).

### B.   The alleged conspiracy and water theft

In counts 1 and 2 of the indictment, the government alleges that as the general manager of PWD, Mr. Falaschi directed the theft of water from the Bureau of Reclamation, an agency of the U.S. Department of the Interior.  Count 1 charges a conspiracy in violation of 18 U.S.C. § 371 and count 2 charges theft of government property (water) in violation of 18 U.S.C. § 641.[3] ECF No. 1, at 1-7.  In particular, count 1 alleges that starting no later than in or around 1992 and continuing through on or about April 30, 2015, Mr. Falaschi and others conspired "to steal, purloin, and convert to their own and PWD's federal water from the DMC that belonged to the Bureau of Reclamation so as to increase the overall amount of water that PWD had available to sell to its customers and to pump back into the DMC for credits . . . ." *Id.,* ¶ 10.[4]

According to the indictment, in or around 1992, water "was leaking . . . from the DMC into a parallel canal that PWD controlled." *Id.*, ¶ 12.  Specifically, the water leaked into a standpipe adjacent to a farm owned by a family.  *Id.*  The DMC water leaking into the standpipe cracked the gate inside the standpipe, which had been cemented closed.  *Id.*  Water came through the cracked cement into a canal that PWD controlled.  *Id.*  The site was referred to as a "Lift" and named after INDIVIDUAL 1 because it was adjacent to a farm owned by INDIVIDUAL 1's family.  *Id.;* **Exhibits B(1) and B(2)**.[5]  The site referred to as the "Lift" was called the Linneman Lift, and named after the owner of the standpipe and President of the PWD board of directors,

---

[3] Counts 3-5 involve unrelated charges of filing false tax returns for tax years 2014, 2015, and 2016, respectively, in violation of 26 U.S.C. § 7206(1).

[4] The allegation that PWD pumped water it received back into the DMC for credit is completely false and has never occurred as evident by the indictment's failure to identify a single occasion, let alone an occasion within the statute of limitations, of PWD pumping its water back into the DMC for credit.

[5] Attached as Exhibit B(1) is a Full Property Detail Report of Fresno County Parcel # (APN) 004-080-51S.  Attached as Exhibit B(2) is a copy of the Fresno County Assessor's Map Bk.4, pg. 8.

Mike Linneman, who ran the water issues for PWD, significant facts not included in the indictment.  **Exhibit C**.[6]

The Indictment alleges that after the leaking DMC water cracked the gate inside the standpipe that had been cemented closed, Mr. Falaschi instructed Employee 2 to install a new gate inside the standpipe so that the Lift could be opened and closed.  ECF No. 1, ¶ 13.  Mr. Falaschi allegedly later instructed Employee 2 to install a lid with a lock on top of the standpipe that prevented people from seeing that the gate inside the standpipe was functionable.  *Id.*  Allegedly, Mr. Falaschi instructed Employee 2 to install a two-foot elbow pipe off the valve of the standpipe angled down into PWD's canal to conceal the "theft" because it enclosed the flow from the DMC into PWD's canal where the unmetered water travelled to a pump station, was lifted into PWD's broader canal system, combined with PWD's other water sources and was sold to PWD's customers.  *Id.*

According to the Indictment, between 1992 and on or about April 30, 2015, Mr. Falaschi repeatedly instructed his employees to use the Lift to take water from the DMC.  *Id.*, ¶ 14.  In counts 1 and 2, the Indictment charges two specific instances, one in March and one in April of 2015, when Mr. Falaschi allegedly told Employee 3 to have Employee 2 open the standpipe gate to access the leak from the DMC into PWD's canal.  *Id.*, ¶¶ 19-30.  In total, the Indictment alleges that Mr. Falaschi and co-conspirators caused over 130,000 acre-feet of water to be improperly taken from the DMC through the Lift over a 23-year period, an average of approximately 15.5 acre-feet per day or 5,652 acre-feet per year, with a total value of over $25,000,000.  *Id.*, ¶ 16.

Employee 3, Chris Bettencourt, testified before a 2017 grand jury panel that he opened the standpipe and diverted water from the DMC at the request of Michael Linneman, a PWD

---

[6] Attached as Exhibit C is a copy of PWD minutes of the meetings of the Board of Directors for PWD on January 14, 1992, and January 12, 1993, each of which records Mike Linneman as the President of the PWD board of directors.

USA v. Falaschi, 1:22-CR-00103-JLT
Motion to Dismiss

1    board member, farmer, and son of former PWD board president, Mike Linneman.  **Exhibit D**.[7]

2    When a grand juror from the 2017 panel asked whether Mr. Linneman approved of accessing

3    DMC water from the standpipe, Employee 3 answered yes, Mr. Linneman would contact him

4    (Employee 3) to access the water and talk to him about it.  Exh. D at 56:9-57:4.  Employee 3

5    further testified:

6        Q.    So he [Mr. Linneman] would use that water to water his cotton fields?

7        A.    Correct.  Either himself or his head irrigator would call and say, "Hey, the canal is
running a little bit low.  You guys need to add some more Linneman lift water in

8                  there so we can run our pumps."  And we didn't meter or monitor any of his water

9                  outtake.  So he farmed, essentially, for free.

10       Q.    It was a good deal for him?

11       A.    And he's a board member also.

12   Exh. D at 57:10-19.[8]

13

14

15   _____

16   [7] This testimony from Employee 3 before the 2017 Grand Jury Panel was likely not presented to
the grand jury that indicted Mr. Falaschi on or about April 14, 2022.

17

18   [8] On July 12, 2016, prior to testifying before the 2017 grand jury panel, Employee 3, Chris
Bettencourt, was interviewed by federal agents and told the agents that he would access the

19   standpipe when "Tayo," Mr. Linneman's foreman, called him (Employee 3) and requested "fresh
water."  **Exhibit E,** government's interview of Chris Bettencourt on July 12, 2016, at lines 1157-

20   1162.  Employee 3 told agents during the interview that Mr. Linneman was aware of, and used,
the diversion because he (Mr. Linneman) would pull out a little pump "and irrigate all that land

21   for free." *Id*. at lines 1137-1191.  Employee 3, Mr. Bettencourt, provided the following statement
to federal agents:

22

23       Q:    Was he stealing water or was – it known?

24       A:    No, it was – it – it was known because his guy – his foreman, (Tayo) would call
me and say hey, that diversion – he wouldn't call it the diversion.  He'd ca – we'd

25                 ca – used to call it he (Lin) drain 'cause it borders (Lindeman)'s property.  So it's
called the (Lin) drain.  He'd say hey, the (Lin) drain's running really low.  I think

26                 you guys need to put some more fresh water in there.  I can't run my pump to

27                 irrigate.

28       *Id*. at lines 1157-1162.

C.     **PWD's contracts with the Bureau of Reclamation**

The Bureau of Reclamation's initial contract with PWD was entered in 1955.  **Exhibit F(1)**.  A superseding contract was reached in 1974.  Exh. F(2).  Thereafter, an interim renewal contract was entered in 2009, Exh. F(3), and renewed in 2011, 2013, 2015, and 2017.  Exhs. F(4)-(7).

The original 1955 contract stated that the Bureau shall deliver up to 94,000 acre-feet of water per year to PWD through the DMC for a forty-year period.  Exh. F(1), at 3, ¶ 2-3.  The second 1974 contract superseded the original and ran through December 31, 2008.  Exh. F(2), at 5, ¶ 2(b).  It similarly obligated the Bureau to make available for delivery between 80,000 and 94,000 acre-feet of water per year to PWD.  *Id.* at 6, ¶ 3(a).

The contract stated that the water to be furnished to PWD would be measured by the United States at the points of delivery.  *Id.* at 19, ¶ 10(b).  It further provided that the United States did not have any right to claim "*waste, seepage, or return flow*, to water being used pursuant to this contract for surface irrigation or under-ground storage within the Contractor's service area boundaries":

> Provided, That the United States reserves the right to all waste, seepage, and return flow water derived from water furnished to the Contractor [PWD] hereunder and which escapes or is discharged beyond the Contractor's Service area boundaries and nothing herein shall be construed as abandonment or a relinquishment by the United States of any such water, *but this shall not be construed as claiming for the United States any right, as waste, seepage, or return flow, to water being used pursuant to this contract for surface irrigation or under storage within the Contractor's service area boundaries* by the Contractor or those claiming by, through, or under the Contractor.

*Id.*, at 19, ¶ 10(c) (emphasis added).  The parties thus contemplated, recognized, and agreed that seepage water could be used by PWD for surface irrigation consistent with the terms of the contract.

In the 2009 interim renewal contract, the parties clarified and expanded the authorized use of seepage under the contract.  PWD had the right to "seepage or return flow being put to reasonable or beneficial use" as follows:

(c)     The United States reserves the right to all seepage and return flow water derived from Water Delivered to the Contractor [PWD] hereunder which escapes or is discharged beyond the Contractor's Service Area; <u>Provided</u>, ***That this shall not be construed as claiming for the United States any right to seepage or return flow being put to reasonable and beneficial use pursuant to this Contract within the Contractor's Service Area*** by the Contractor or those claiming by, through, or under the Contractor.

Exh. F(3), at 30, ¶ 11(c) (emphasis added).  This same contract was renewed in 2011, 2013, 2015, and 2017.  Exhs. F(4)-(7).  In other words, there was no charge or price for any seepage used within PWD.

### III.     Argument

### A.     <u>The law</u>

Federal Rule of Criminal Procedure 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  Motions to dismiss for failing to state an offense must be made before trial.  Fed. R. Crim. P. 12(b)(3)(B)(v).  "A motion to dismiss is generally 'capable of determination' before trial if it involves questions of law rather than fact."  *United States v. Nukida,* 8 F.3d 665, 669 (9th Cir. 1993) (quoting *United States v. Shortt Accountancy Corp.,* 785 F.2d 1448, 1452 (9th Cir. 1986) (*Shortt*)).  Moreover, "a motion requiring factual determinations may be decided before trial if 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the offense."  *Shortt,* 785 F.2d at 1452 (*quoting United States v. Covington,* 395 U.S. 57, 60 (1969)); *see also United States v. Levin*, 973 F.2d 463, 469-70 (6th Cir. 1992) (affirming district court dismissal of indictment charging Medicare fraud where undisputed extrinsic evidence established that government could not prove beyond a reasonable doubt the defendants acted with the requisite intent); *Moore's* ¶ 12.04[1] at 12-39 (1985).

"Federal law governs the interpretation of contracts entered into pursuant to federal law and to which the government is a party."  *Smith v. Cent. Ariz. Water Conservation Dist.,* 418 F.3d 1028, 1034 (9th Cir. 2005).  When interpreting a contact according to principles of federal

common law, the courts look to "general principles for interpreting contracts." *County of Santa Clara v. Astra United States,* 588 F.3d 1237, 1243 (9th Cir. 2009).  Under the general principles of contract interpretation, "[c]ontract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself." *Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1210 (9th Cir. 2000).  When interpreting a contract under federal common law, courts must give the words of a contract their "common or normal meaning" unless circumstances show a more specialized meaning is intended. *Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.3d 75, 77 (9th Cir. 1987).

"One tenant of contract law we have steadfastly applied . . . is that of contra proferentem, 'the principle that ambiguities in contracts 'are to be construed unfavorably to the drafter.'" *United States v. Transfiguracion*, 442 F.3d 1222, 1228 (9th Cir. 2006) (quoting *BLACK'S LAW DICTIONARY* 328 (7th ed. 1999)).  In the context of plea agreements, which at bottom is a contract between the government and a defendant, "the government is usually the drafter and must ordinarily bear the 'responsibility for any lack of clarity.'" *Id.* (quoting *United States v. Franco-Lopez*, 312 F.3d 984, 989 (9th Cir. 2002)).  The lack of specificity is "a failure to cover a predictable contingency." *Id*. at 1232.

"The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Hunt Wesson Foods, Inc.*, 817 F.3d at 77.  A contract "must be read as a whole and every part interpreted with reference to the whole." *Shakey's Inc. v. Covalt,* 704 F.2d 426, 434 (9th Cir. 1983).  The determination whether contract language is unambiguous is a question of law. *Klamath Water Users,* 204 F.3d at 1210.

> **B.** **The Court should dismiss counts 1 and 2 because the water discharges charged in those counts are permitted "seepages" under the Water District's contract with the Bureau of Reclamation.**

All DMC water the indictment alleges was stolen, was seepage from a drain into the standpipe of the PWD Board President, which was adjacent to a canal and farm owned by the

1  board president's family, the Linneman family.  The PWD board was responsible for obtaining

2  the DMC water and has fully paid for it.

3      The DMC water that leaked into the standpipe was seepage combined with PWD's other

4  water sources.  The DMC water was not sold by Mr. Falaschi to any third party, but rather, the

5  water was seepage used by PWD within its own boundaries.  Mr. Falaschi never received a

6  penny for the DMC water.

7      The seepage was the loss of water (approximately ¼ of 1%) by its slow movement

8  through the wall of the DMC.  PWD's water contracts authorize PWD to use, and thereby

9  manage, control, and direct, this seepage from the DMC.  Instillation of a gate to manage,

10  control, and use seepage thus is directly contemplated in the contracts.  Because the seepage

11  charged in the indictment is not stolen water but water PWD was authorized to use and not pay

12  for by PWD's contracts with the Bureau of Reclamation, there could not be, and there was no,

13  water theft as charged in count 2 and no conspiracy to steal water as charged in count 1.

14      **IV.    Conclusion**

15      For the reasons set forth above, the Court must dismiss counts 1 and 2.

16

17      Dated:  December 2, 2022          Respectfully submitted,

18

19                                        /s/ Oliver W. Wanger
                                          OLIVER W. WANGER

20
                                          /s/ Marc Days
21                                        MARC DAYS

22                                        /s/ John Balazs
                                          JOHN BALAZS
23

24                                        Attorneys for Defendant
                                          DENNIS FALASCHI
25

26

27

28