OLIVER W. WANGER, Bar No. 40331
Wanger Jones Helsley PC
265 E. River Park Circle, Suite 310
P.O. Box 28340
Fresno, CA 93729
Telephone: (559) 233-4800
Fax: (559) 233-9330
owanger@wjhattorneys.com

MARC DAYS, Bar No. 184098
Days Law Firm
1107 R Street
Fresno, CA 93721
Telephone: (559) 708-4844
Fax: (559) 486-1826
marcdays@dayslawfirm.com

JOHN BALAZS, Bar No. 157287
Attorney at Law
916 2nd Street, Suite F
Sacramento, CA 95814
Telephone: (916) 447-9299
Fax: (916) 557-1118
balazslaw@gmail.com

Attorneys for Defendant
DENNIS FALASCHI

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:22-CR-00103-JLT |
| Plaintiff, | **Defendant Dennis Falaschi's Reply to Government's Opposition to Motion to Dismiss Counts 1-2** |
| v. | |
| DENNIS FALASCHI, | Motion Hearing:<br>Date: January 23, 2023<br>Time: 10 a.m.<br>Hon. Jennifer L. Thurston |
| Defendant. | |

I. **INTRODUCTION**

The indictment alleges water leaked from the Delta Mendota Canal (DMC) into a farmer's standpipe, then into the Panoche Water District (PWD) canal system, where it was combined with PWD's other water sources and sold to PWD's customers. [Dkt. 1 at 13]. Defendant Dennis Falaschi moves, pursuant to Federal Rule of Criminal Procedure 12(b), to dismiss counts 1 and 2 on the grounds the water at issue, described as leaking from the DMC, was seepage PWD was authorized to put to reasonable and beneficial use pursuant to PWD's water contracts with the Bureau of Reclamation (Bureau) without any payment.

Seepage is the loss of water from a watercourse or body of water through its slow movement through the ground or a wall. *Ballentine's Law Dictionary*, (3rd Ed. 2010). The indictment alleges 0.25% (1/4 of 1%) of the water flowing through the DMC leaked, or seeped, from the DMC. [Dkt. 1 at ¶¶6, 9, and 16].[1] The government estimates 82 gallons per day as the average per capita water use, or 328 gallons per day for a family of four.[2] Relative to a loss of 0.25% from the DMC, a loss of 0.25% of water delivered to a family of four equals a water loss at the rate of 4.352 ounces per hour, approximately ½ cup per hour. According to the federal Environmental Protection Agency (EPA), a showerhead leaking at 10 drips per minute, a drip every six seconds, losses more than 500 gallons per year, a loss of at least 0.41% of the average amount of water delivered to a family of four, a rate of water loss 61% greater than the alleged rate of water loss from the DMC, 0.25%.[3]

---

[1] The indictment alleges 2,000,000 acre feet (AF) of water pass through the DMC each year and over an approximate 23 year period of time, 130,000 AF leaked from the DMC into the standpipe, an average of 5,652 AF per year or 15.5 AF per day, a seepage rate of 0.25% (1/4 of 1%) of the water the government alleges passing through the DMC. None of this is accurate. The defense intends to prove the volume alleged by the government is ridiculous, but nonetheless, for purposes of this motion the defense will address the volume alleged by the government.

[2] Dieter, C.A., and Maupin, M.A., 2017, Public supply and domestic water use in the United States, 2015: U.S. Geological Survey Open-File Report 2017–1131, 6 p., https://doi.org/10.3133/ofr20171131.

[3] Environmental Protection Agency. (n.d.). Fix a Leak Week | US EPA. EPA. Retrieved January 17, 2023, from https://www.epa.gov/watersense/fix-leak-week. According to the government, a faucet that leaks at the rate of one drip per second can waste more than 3,000 gallons per year. *Id*.

The government opposes the motion, arguing Mr. Falaschi, and others at PWD, "conspired to exploit" the leak in the DMC and "did not passively allow ***water to seep*** through as he appears to argue in his motion." [Gov't Opp. at 3] [italics and bold added for emphasis]. The government argues it does not agree with the defense's interpretation of the contract and that it is a question of fact for the jury whether use of the seepage was authorized. This is inaccurate and false. The contract makes clear that use of seepage was authorized and the government does not dispute the grand jury never received the contracts or considered whether the contracts authorized use of the seepage in question.

As set forth below, the Ninth Circuit has repeatedly held that the interpretation of a contract, whether a question of law or a mixed question of law and fact, is an issue for the court to decide and subject to de novo review. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999); *O'Neill v. United States*, 50 F.3d 677, 682 (9th Cir. 1995); *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989). PWD's water contract authorized PWD to surface irrigate with seepage, store seepage, and put seepage to reasonable and beneficial use, thereby authorizing the use, direction, control, and management of seepage from the DMC, without any payment. Thus, there was no theft as a matter of law.

## II. ARGUMENT

### A. THE COURT HAS THE POWER TO DECIDE MR. FALASCHI'S MOTION TO DIMISS BEFORE TRIAL BECAUSE THE INTERPRETATION OF A CONTRACT IS AN ISSUE OF LAW FOR THE COURT NOT THE JURY.

The government contends that the motion to dismiss ignores controlling authority and that Mr. Falaschi's motion cannot be adjudicated before trial in a motion to dismiss. This is incorrect on both points.

Indeed, both parties rely on the same propositions of law. The parties agree that a motion to dismiss is proper "when the challenge 'involves questions of law rather than fact.'" Gov't Opp. at 3 (quoting *United States v. Nukida,* 8 F.3d 665, 669 (9th Cir. 1993); *see* Mtn. Dismiss at 8

---

For a household of four a loss of 3,000 gallons represents a loss of 2.5% of the annual amount of water delivered to the household, which is ten times the rate of water loss from the DMC. *Id*.

3

(quoting same proposition).  The parties also agree that "a motion requiring factual determinations may be decided before trial if 'trial of the facts surrounding the commission of the offense would be of no assistance in determining the validity of the offense.'"  Mtn. Dismiss at 8 (quoting *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986); *see* Gov't Opp. at 3 ("The Court can make preliminary findings of fact necessary to decide the legal questions presented by the motion if it can do so without 'invad[ing] the province of the ultimate finder of fact.'") (quoting *Nukida,* 8 F.3d at 669); *see also* Fed. R. Crim.P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits.").[4]

Federal law governs the interpretation of contracts where the government is a party. *O'Neill v. United States, supra* 50 F.3d at 682 (interpreting Westlands Water District's water service contract with the Bureau).  The determination of whether a contract's language is ambiguous is a question of law.  *Id.; Klamath Water Users Protective Ass'n v. Patterson, supra* 204 F.3d at 1210;  *Kennewick Irrigation Dist. v. United States, supra* 880 F.2d at 1033 (holding government's interpretation ambiguous, so viewed "the provision must be interpreted against the government, its drafter").

Contract interpretation is reviewed de novo.  *O'Neill v. United States, supra* 50 F.3d at 682;  see also *Klamath Water Users Protective Ass'n v. Patterson, supra* 204 F.3d at 1210 (interpretation of a contract is a mixed question of law and fact subject to de novo review).  Since the interpretation of a contract is subject to de novo review, whether an issue of law or a mixed question of law and fact, the interpretation of a contract is to be decided by the court and does not invade the province of the jury.  *Cung Le v. Zuffa, LLC*, 108 F. Supp.3d 768, 777 (N.D. Cal. 2015) ("It cannot be left to the jury to decide which side's interpretation of the contract is the correct one because contract interpretation is an issue of law.") (interpreting Nevada law).

---

[4] Mr. Falaschi's motion does not argue that the Indictment fails to state an offense on its face. *See United States v. Boren,* 278 F.3d 911, 914 (9th Cir. 2012); *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir.1996).  Nor does the motion allege that the charges are not based on sufficient evidence. *Jensen*, 93 F.3d. at 669.

PWD's latest contracts with the Bureau of Reclamation unambiguously state that the United States does not have "any right to seepage or return flow being put to reasonable and beneficial use pursuant to this Contract within the Contractor's Service Area by the Contractor [PWD] or those claiming by, through, or under the contract." [Dkt 22-9 at 34 of 64]. Mr. Falaschi's motion to dismiss confirms, as alleged in the indictment, that the water leaking from the DMC into a standpipe was "seepage" PWD was fully authorized to use without charge by its contracts with the Bureau. Therefore, there was no requirement to pay for the seepage. This proves there was no water theft.

What is seepage is a matter of law, a legal issue ripe for pretrial determination by the court. The interpretation of a contract, whether a question of law or mixed question of law and fact, is a legal determination subject to de novo review. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999); *O'Neill v. United States*, 50 F.3d 677, 682 (9th Cir. 1995); *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989).

### B. WATER LEAKING FROM THE DMC WAS SEEPAGE THAT PWD WAS AUTHORIZED TO USE.

PWD's initial 1955 water contract, and subsequent 1974 water contract, with the Bureau authorized PWD to use seepage from the DMC for surface irrigation or storage within PWD.[5] PWD's 2009 interim renewal water contract with the Bureau broadened PWD's authorized use of seepage from the DMC beyond simply surface irrigation and storage. The 2009 contract, and each water contract thereafter, authorized PWD to use seepage if it was put to "reasonable and beneficial use" within PWD.[6]

---

[5] The 1955 water contract provided that the United States did not have any right to claim "waste, seepage, or return flow, to water being used pursuant to this contract for surface irrigation or underground storage within the District's boundaries by the District or those claiming by, through, or under the District." [Dkt 22-7 at pg. 12 of 30]. The 1974 water contract provided that the United States did not have any right to claim "waste, seepage, or return flow, to water being used pursuant to this contract for surface irrigation or under-ground storage within the Contractor's service area boundaries by the Contractor or those claiming by, though, or under the Contractor." [Dkt 22-8 at pg 22 of 57].

[6] The 2009 interim renewal contract clarified and expanded the authorized use of seepage under the contract as follows:

5

      The government's opposition states it does not agree with the defense's interpretation of the contract provision or concede that the provision applies. The government provides no argument, evidence, or legal authority as to why it does not agree with the defense's interpretation of the provision or why the provision does not apply.

      Water from the DMC seeped into the standpipe and cracked a gate in the standpipe. Replacement of the cracked gate does not convert the water seeping from the DMC into the standpipe into something other than seepage. Opening the gate to use the seepage does not convert the seepage into something other than seepage because use of the seepage was authorized by PWD's contracts. Similarly, placing a lid with a lock on top of the standpipe and elbow pipe off the standpipe does not convert water seeping from the DMC into the standpipe into something other than seepage.[7]

///

///

///

///

///

---

    (c)    The United States reserves the right to all seepage and return flow water derived from Water Delivered to the Contractor [PWD] hereunder which escapes or is discharged beyond the Contractor's Service Area; <u>Provided</u>, **That this shall not be construed as claiming for the United States any right to seepage or return flow being put to reasonable and beneficial use pursuant to this Contract within the Contractor's Service Area** by the Contractor or those claiming by, through, or under the Contractor. [Dkt 22-9 at pg. 34 of 64] [see also Dkt 22-10 at pg. 3 of 8; Dkt 22-11 at pg. 3 of 8; Dkt 22-12 at pg. 3 of 8; Dkt 22-13 at pg. 2 of 4].

[7] Accessing the seepage was done at the direction of the PWD board. Employee 3, Chris Bettencourt, testified before a 2017 grand jury panel that he opened the standpipe and diverted water from the DMC at the request of Michael Linneman, a PWD board member and farmer. [Dkt 22-5 at pgs 4-5]. The government does not dispute that the grand jury that indicted Mr. Falaschi was not informed the board directed accessing the seepage or of the water contracts between PWD and the Bureau. The PWD board members profited from utilizing the seepage, not Mr. Falaschi, who was paid a salary substantially less than other Special District General Managers as a matter of public record. [Dkt. 22 at fn.1]. Yet to try to create a motive, the government falsely alleges Mr. Falaschi was paid an exorbitant salary.

The use, direction, storage, control, and management of seepage is clearly contemplated in the contracts by the clear authorization of the use of seepage, initially for surface irrigation and storage, then broadened to reasonable and beneficial use. Seepage cannot be stored, used to irrigate, or otherwise put to reasonable and beneficial use unless it is directed to a location and managed and controlled to prevent flooding and other potential forms of damage caused by water that is not directed, stored, controlled, or managed properly.

PWD was totally authorized to use water that seeped from the DMC into the farmer's standpipe. After replacement of a cracked gate in the standpipe, caused by the seepage, water continued to seep from the DMC into the standpipe.

The water contract authorized PWD to use the seepage and no argument or authority is provided by the government as to why PWD was not authorized to use seepage from the DMC that went into the standpipe after the gate was replaced. Similarly, placement of a lid and lock on the standpipe and elbow off the standpipe in no way deauthorized the use of the seepage and no argument, evidence, or authority is provided by the government in support of such an argument.

### III. CONCLUSION

For the reasons set forth above and in the initial motion to dismiss, the Court should dismiss counts 1-2.

Dated: January 18, 2023

Respectfully submitted,

/s/ Oliver W. Wanger
OLIVER W. WANGER

/s/ Marc Days
MARC DAYS

/s/ John Balazs
JOHN BALAZS

Attorneys for Defendant
DENNIS FALASCHI