OLIVER W. WANGER, Bar No. 40331
Wanger Jones Helsley PC
265 E. River Park Circle, Suite 310
P.O. Box 28340
Fresno, CA 93729
Telephone: (559) 233-4800
Fax: (559) 233-9330
owanger@wjhattorneys.com

MARC DAYS, Bar No. 184098
Days Law Firm
1107 R Street
Fresno, CA 93721
Telephone: (559) 708-4844
Fax: (559) 486-1826
marcdays@dayslawfirm.com

JOHN BALAZS, Bar No. 157287
Attorney at Law
916 2nd Street, Suite F
Sacramento, CA 95814
Telephone: (916) 447-9299
Fax: (916) 557-1118
balazslaw@gmail.com

Attorneys for Defendant
DENNIS FALASCHI

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:22-CR-00103-JLT |
| Plaintiff, | **Defendant Dennis Falaschi's Supplemental Brief in Support of Motion to Dismiss** |
| v. | |
| DENNIS FALASCHI, | ***Request For Evidentiary Hearing*** |
| Defendant. | |

## I.      INTRODUCTION

At the hearing on Defendant's motion to dismiss the court invited the defense to file supplemental briefing on why its chosen definition of "seepage" makes more sense than what some other courts have adopted and address the meaning of "leakage."  [TX at 27:23-28:3].[1]  For reasons discussed below, it makes more sense that what is described as "leakage" in the indictment is "seepage" under the water contracts when considering:  dictionaries during the time period of the initial 1955 contract defined seepage as leakage; the contract as a whole; and extrinsic evidence.  At minimum, the defense's definition of seepage under the contract is a reasonable interpretation and if there is more than one reasonable interpretation, the term is ambiguous and should be construed against the drafter.

As concerns extrinsic evidence, the defense requests an evidentiary hearing to establish prior course of dealing, usage of trade, and course of performance if any facts set forth below are disputed by the government.  The evidence establishes that the water flowed from the Delta Mendota Canal (DMC) into a ditch controlled by Panoche Water District (PWD) through a drain or pipe in the DMC wall, the alleged leakage in the indictment, is unambiguously seepage in the water contract.  Alternatively, the defense requests an evidentiary hearing to establish that a reasonable, if not best, interpretation of the contract would consider the leakage alleged in the indictment as seepage.

The "leakage" alleged in the indictment is "seepage" under the water contracts because "seepage" is commonly defined as "leakage."  Barnhart, C.L. (1953) *The American College Dictionary.  Random House*; Stein, J. (1966) *The Random House Dictionary of the English Language, The Unabridged Edition*.  [**Exhibit A**][2] [**Exhibit B**].[3]  "Seepage" is defined as "the act or process of seeping; ***leakage***."  *Ibid.*  Each version also defines "seepage" as "something that

---

[1] Notably, the term seepage appears in the water contracts, not the word "leakage" or "leak."  [Dkt 22-7 through 22-13].

[2] Attached as **Exhibit A** are excerpts defining seepage and leakage in Barnhart, C.L. (1953) *The American College Dictionary.*

[3] Attached as **Exhibit B** are excerpts defining seepage and leakage in Stein, J. (1966) *The Random House Dictionary of the English Language, The Unabridged Edition..*

*seeps or leaks* out." *Ibid.* As noted below, the defense acknowledges different dictionaries provide different definitions for the term "seepage."

Mr. Falaschi's definition makes more sense than the cases referenced by the Court, *Syfco v. Encompass Indemnity Corp.*, 761 F.3d 867 (8th Cir. 2014) and *McKain v. Safeco Ins. Co. of Am.*, 2022 WL 3655258 (D. Mont. 2022). *Syfco* cites a dictionary, *Random House Webster's College Dictionary* (1999), that did not exist at the time PWD and the Bureau entered into their first water contract in 1955. *Syfco, supra* at 872. In *McKain*, the issue was whether the term "over" in the long-term leak exclusion provision was ambiguous. *McKain v. Safeco Ins. Co. of Am.*, supra 2022 WL 3655258, at 1. Because both parties described the water at issue in the case as a leak, the court was never asked to distinguish between leakage and seepage. *Id.*[4]

Evidence of course of dealing, usage of trade, and course of performance establish that what is described as "leakage" in the indictment is seepage under PWD's water contract with the Bureau. Specifically, evidence proves that for over a decade the DMC was knowingly managed in a manner in which DMC water that entered PWD through drains or pipes in the wall of the DMC was treated as seepage, which PWD was authorized to use free of charge under its water contract. At minimum, the evidence proves that what is described as "leakage" in the indictment can be reasonably interpreted as "seepage" under the water contracts.

## II.   DEFINITION OF SEEPAGE

Random House's first dictionary, published in 1947, *The American College Dictionary*, along with its successor, *The Random House Dictionary of the English Language, The Unabridged Edition*, define seepage as "the act or process of seeping; **leakage.**" [Exhibits A and B]. As noted above, the *Random House Webster's Coll. Dictionary (1999),* cited by the Eighth Circuit in *Syfco,* did not exist in 1955 when PWD entered into its initial water contract.

Furthermore, "college" dictionaries, such as Random House Webster's Coll. Dictionary (1999), are recognized as abridged dictionaries. *Merriam-Webster, Inc. v. Random House, Inc.*,

---

[4] The contracts at issue in *Syfco* and *McKain* contained the terms "seepage" and "leakage." However, PWD's water contracts with the Bureau only contain the term "seepage" and do not contain the word "seep," "leak," or "leakage." This further suggests that "seepage" in PWD's water contract was meant to cover both.

35 F.3d 65, 72 (2ⁿᵈ Cir. 1994) ("Merriam-Webster's expert testified, and other evidence also demonstrates, that 'college' describes the genre of hardcover, desk-top, abridged dictionaries"). The Random House college dictionary cited by the *Syfco* court is an abridgment of *The Random House Dictionary of the English Language, The Unabridged Edition* (1966).  *Merriam-Webster, Inc. v. Random House, Inc.*, supra, 35 F.3d at 68.[5]  An abridged version, like that cited by the *Syfco* court is neither comprehensive nor complete.

The *Syfco* court concluded the water damage at issue resulted from "water leaking through a crack."  *Syfco v. Encompass Indem. Co., supra,* 761 F.3d at 872.  Notably, in *McKain* the dictionary cited by the district court, *Merriam-Webster,* provides an example of seep in a sentence: "water seeped in through a crack."  *McKain v. Safeco Ins. Co. of Am.*, supra 2022 WL 3655258, at 2;  *see also Jenkins v. Bill Laurence, Inc.*, 2000 U.S. Dist. LEXIS 17544 at 10-11 (E.D. La. 2000) ("The fact that the benzene ***leak*** was seepage . . . is further evidenced by the fact that plaintiff Jenkins was sent to *repair the **leak**.*") (italics, bold, and underline included).[6]

In *Syfco* and *McKain* different dictionaries are cited, begging the question of whether a person's liberty should be put at risk based on the dictionary chosen to interpret a term in a contract and a term not in a contract, allowing for arbitrary and disparate outcomes.  The following is a chart of different dictionaries defining the terms seepage and leakage:

///

///

///

///

///

---

[5] "Random House has published a 'college' dictionary [American College Dictionary] since 1947. In 1968, it titled its product 'The Random House College Dictionary.' . . . in 1990 . . . Random House introduced a dictionary titled *Webster's College Dictionary*."  *Merriam-Webster, Inc. v. Random House, Inc.*, supra, 35 F.3d at 68.

[6] In *Jenkins* the court held an insurance contract exclusion provision for seepage applied to an oil spill from leaks. *Jenkins v. Bill Laurence, Inc.*, 2000 U.S. Dist. LEXIS 17544 at 4-6, 10-11, and 18.  The term "leak" was not in the exclusion provision nor apparently in the contract.  *Id*.

| Source | Seepage Definition | Leakage Definition |
|---|---|---|
| **American College Dictionary**<br><br>Barnhart, C.L. (1953) *The American College Dictionary*. Random House. | Noun.<br>1. Act or process of seeping; leakage<br>2. That which seeps or leaks out | Noun.<br>1. Act of leaking; leak.<br>2. That which leaks in or out.<br>3. The amount that leaks in or out.<br>4. An allowance for loss by leaking. |
| **Random House Dictionary of the English Language, The Unabridged Edition**<br><br>Stein, J. (1966) *The Random House Dictionary of the English language, The Unabridged Edition.* Random House. | Noun.<br>1. The act or process of seeping; leakage.<br>2. Something that seeps or leaks out.<br>3. A quantity that has seeped out. | Noun<br>1. An act of leaking; leak.<br>2. Something that leaks in or out.<br>3. An allowance for loss by leaking.<br>4. The loss of all or part of a useful agent, as of the electric current that flows through an insulator or of the magnetic flux that passes outside useful flux circuits. |
| **Cambridge Dictionary** | Noun.<br>1. A process in which a liquid flows slowly out of a hole or through something.<br><br>Seepage. SEEPAGE \| definition in the Cambridge English Dictionary. (n.d.). Retrieved January 24, 2023, from https://dictionary.cambridge.org/us/dictionary/english/seepage | Noun.<br>1. The act of leaking or the leak itself.<br><br>Leakage. LEAKAGE \| definition in the Cambridge English Dictionary. (n.d.). Retrieved January 24, 2023, from https://dictionary.cambridge.org/us/dictionary/english/leakage |
| **Britannica Dictionary** | Noun.<br>1. An occurrence in which a liquid or gas flows or passes slowly through small openings.<br><br>Encyclopædia Britannica, inc. (n.d.). Encyclopædia Britannica. Retrieved January 24, 2023, from https://www.britannica.com/dictionary/seepage | Noun.<br>1. An occurrence in which something (such as a liquid or gas) passes through a hole in a surface.<br>2. The amount that is lost when something leaks.<br>3. Taking steps to prevent leakage of confidential information.<br><br>Encyclopædia Britannica, inc. (n.d.). Encyclopædia Britannica. Retrieved January 24, 2023, from https://www.britannica.com/dictionary/leakage |

1

2

**III.    EXTRINSIC EVIDENCE ESTABLISHES THAT THE BEST INTERPRETATION OF THE TERM SEEPAGE IN THE WATER CONTRACT INCLUDES DMC WATER DESCRIBED IN THE INDICTMENT AS LEAKING FROM A DRAIN INTO A PWD CONTROLLED DITCH.**

3

4

5

The Uniform Commercial Code (UCC) is a source of federal common law and may be relied upon in interpreting a contract to which the federal government is a party.  *O'Neill v. United States*, 50 F.3d 677, 684 (9th Cir. 1995).  The UCC permits the use of extrinsic evidence in a manner that substantially narrows the traditional application of the parole evidence rule.  *Id*. UCC 2-202 provides that terms set forth in a contract may be explained or supplemented by extrinsic evidence of course of dealing, usage of trade, or course of performance.  *O'Neill v. United States, supra*, 50 F.3d at 684 (quoting UCC Section 2-202).

6

7

8

9

10

11

12

Extrinsic evidence may be considered even if the contract terms are clear.  *O'Neill v. United States, supra*, 50 F.3d at 684.  A determination of ambiguity is not a condition precedent to the admissibility of extrinsic evidence.  *Id*.

13

14

15

16

17

18

19

20

21

The DMC is federally managed.  [Dkt 1 at ¶6].  Evidence will prove the San Luis Delta Mendota Water Authority (Authority) manages and monitors the DMC on behalf of the federal government.  Evidence proves the DMC was intentionally managed by the Authority in a manner which allowed, free of charge, PWD and other water districts to use DMC water that flowed into district ditches through drains and pipes in the wall of the DMC.  Evidence will establish that on a daily basis the Authority knowingly allowed PWD to use, free of charge, water that flowed into PWD controlled ditches through drains and pipes in the wall of the DMC both during and after Mr. Falaschi's employment at PWD, a well-established course of dealing, usage of trade, and course of performance.[7]

22

23

24

25

26

Evidence proves that from at least 2008 through 2020, Mark Walsh, a Hydrology Technician for the Authority, was responsible for monitoring the DMC in PWD on a daily basis. According to Mr. Walsh, for at least a 12 year period, spanning from approximately 2008 to 2020, he was aware DMC water flowed through a "drain pipe" in the wall of the DMC, near

27

28

---

[7] Mr. Falaschi stopped working at PWD in April of 2017.

milepost 91.71, into a ditch operated by PWD.  [**Exhibit C**].[8]   According to Mr. Walsh, except for two months each year (December and January), DMC water gravity fed through the pipe at the rate of at least 10 AF a day into the PWD controlled ditch, DMC water PWD was allowed to use free of charge.  [**Exhibit D**].[9]

Evidence also proves the Authority was aware that for years, and on a daily basis, DMC water continually escaped through a ruptured pipe at MP 100.23 and entered a PWD ditch.  [**Exhibit E**].[10]  According to Mr. Walsh, he was aware that for several years DMC water gravity fed through the ruptured pipe at the rate of 10 AF a day, except for two months, from December through mid January.  [Exhibit D].

Moreover, evidence will establish that since at least 2008 the Authority was aware that the water which is the subject of the indictment was escaping into a PWD controlled ditch.  The indictment alleges the water escaped from an old drain near MP 94.58.  [Dkt. 1 at ¶12].   Mr. Walsh would testify:  he is a Hydrology Technician for the Authority; he was responsible for monitoring the DMC in PWD from approximately 2008 to 2020; from approximately 2008 to April of 2015 he was aware, that near MP 94.58 along the DMC, PWD was blending drainage water with DMC water that escaped from the drain and is the subject of the indictment.  Evidence will establish the need to blend drainage was to minimize damage and prevent sterilization of land and crops due to the government's unlawful failure to provide drainage.[11]  Thus, PWD's use of

---

[8] Attached as **Exhibit C** is a Federal Bureau of Investigation (FBI) FD-302 report documenting a meeting between Mark Walsh and the FBI on March 2, 2020, bates stamped 12114.

[9] Attached as **Exhibit D** is a Federal Bureau of Investigation (FBI) FD-1032 report documenting a phone call between Mark Walsh and the FBI on May 26, 2020, bates stamped 12157.

[10] Attached as **Exhibit E** is a Federal Bureau of Investigation (FBI) FD-302 report documenting a meeting between Mark Walsh and the FBI on April 15, 2020, bates stamped 12127.

[11] Incontrovertible evidence will establish that when the federal government built the San Luis Unit of the Central Valley Project (CVP) it was required by law to provide drainage to remove drain water, which is salty, from PWD and other districts within the San Luis Unit service area. *Firebaugh Canal Co. v. United States*, 203 F.3d 568, at 570 (9th Cir. 2000).  The Ninth Circuit ruled that the government's unlawful failure to provide drainage seriously diminished the viability, including sterilization, of agricultural land in the San Luis United, and that the government has a duty and must provide drainage service under the San Luis Act, passed by

USA v. Falaschi 1:22-CR-00103 JLT
Supplemental Brief in Support of Motion to Dismiss

water seeping into the standpipe as alleged in the indictment was not only authorized under the contract, but it was also necessary to mitigate the damage caused by the government's unlawful failure to provide drainage as required under the law and water contracts.

Evidence will further establish that: the Operations Manager of the Authority was aware of water escaping from the DMC from pipes and drains; that water districts were using the DMC water free of charge; and that in the presence of Mr. Walsh employees of the California Central Irrigation District discussed with the Authority's Operations Manager how the investigation of alleged water theft "ruinded [*sic*] it for everyone," was going to change how the Authority operated, and that the districts were no longer going to be able to get free water.

### IV.   IN THE ALTERNATIVE, EXTRINSIC EVIDENCE ESTABLISHES THAT A REASONABLE INTERPRETATION OF THE TERM SEEPAGE IN THE WATER CONTRACT INCLUDES DMC WATER DESCRIBED IN THE INDICTMENT AS LEAKING FROM A DRAIN INTO A PWD CONTROLLED DITCH.

In the alternative, the evidence establishes that what the indictment describes as "leakage" can reasonably be interpreted as "seepage" under the water contracts based on both the definition of seepage in dictionaries published at the time of the initial contract and evidence of course of dealing, usage of trade, and course of performance.  A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999). (A "written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable ***interpretations***"). *Id.* (emphasis added).

---

Congress in 1960. *Id*. at 578.  Yet the government's unlawful conduct continues to this day and has been continuous and ongoing for over 50 years. Ever since the Ninth Circuit's ruling, each PWD water contract specifically recognizes the Ninth Circuit's holding that the San Luis Act imposed a duty on the federal government requiring it to provide drainage to maintain agricultural productivity.  [Dkt 22-9 at pg. 8 of 64; Dkt 22-10 at 3 of 8; Dkt 22-11 at pg. 3 of 8; Dkt 22-12 at 3 of 8; Dkt 22-13 at pg. 3 of 4].

Incontrovertible evidence will establish that a well-documented method utilized by PWD to manage the drainage dilemma caused by the government's unlawful conduct, is by blending it with other water sources to reduce its salinity and then reusing the blended water. The salt level of drainage in some locations in PWD can exceed 6000 Total Dissolved Solids (TDS).  Irrigation with water over 1000 TDS will at minimum stunt the growth of crops and reduce yields.

USA v. Falaschi 1:22-CR-00103 JLT
Supplemental Brief in Support of Motion to Dismiss

Extrinsic evidence may be considered to determine whether a contract is ambiguous. *O'Neill v. United States, supra,* 50 F.3d at 684.  If a contractual term is ambiguous, extrinsic evidence other than evidence of prior dealings, usage, and performance may be utilized to interpret the parties' intent in light of "earlier negotiations, later conduct, related agreements, and industry wise custom."  *NRDC v. Kempthorne*, 621 F.Supp. 2d 954, 980 (EDCA April 27, 2009) (citing *Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1158 (9th Cir. 2000)).

Extrinsic evidence establishes the DMC was managed in a manner in which on a daily basis water from the DMC was knowingly allowed to enter ditches in water districts through drains and pipes in the wall of the DMC.  [Exhibits C, D, and E].  Evidence further establishes that water districts were allowed to use the DMC water free of charge.  *Ibid*.

Given the definition of seepage as leakage, evidence of the management of the DMC (evidence of prior course of dealing, usage of trade, and course of performance), and reading the contract as a whole, a reasonable if not best interpretation of the term "seepage" in the contract would include what is described as "leakage" in the indictment and water escaping through similar drains or pipes like those located at MP 91.71 and 100.23.  When reading the contract as a whole, it would be unreasonable to interpret the contract as requiring PWD to pay for water that those operating the DMC allowed to escape or as precluding PWD from using the water.

## V.    CONCLUSION

For the reasons discussed above, the defense requests the Court grant the motion to dismiss counts 1 and 2 or, alternatively, grant an evidentiary hearing if a fact above is in dispute.

Dated:  February 6, 2023                        Respectfully submitted,

/s/ Oliver W. Wanger
OLIVER W. WANGER

/s/ Marc Days
MARC DAYS

/s/ John Balazs
JOHN BALAZS

Attorneys for Defendant
DENNIS FALASCHI

**EXHIBIT A**
The American College Dictionary



**EXHIBIT A**
The American College Dictionary: Front Cover and Inside Cover.





**EXHIBIT A**

The American College Dictionary: Copyright Page and Zoomed Portion of Copyright Page.

**leak·age** (lē′kĭj), *n.* **1.** act of leaking; leak. **2.** that which leaks in or out. **3.** the amount that leaks in or out. **4.** *Com.* an allowance for loss by leaking.

**EXHIBIT A**
The American College Dictionary: Page 694, Zoomed Portion Depiction Definition of "Leakage."



**seep·age** (sē/pĭj), *n.* **1.** act or process of seeping; leakage. **2.** that which seeps or leaks out.

**EXHIBIT A**

The American College Dictionary: Page 1097, Zoomed Portion Depicting Definition of "Seepage."

**EXHIBIT B**
The Random House Dictionary of the English Language



THE
RANDOM HOUSE
DICTIONARY
of the
ENGLISH
LANGUAGE

¶ The great explosion of knowledge in science, technology, medicine, the arts—in fact, in every field—in the last few years has resulted in the spectacular expansion of the English vocabulary. This completely new and up-to-date dictionary can now meet your pressing everyday need for clear understanding and effective communication. A comprehensive and fully reliable guide to the English language, *The Random House Dictionary* is an indispensable reference book for use at home, office, school, and college.

¶ Prepared by a staff of more than 350 of the world's leading scholars, educators, linguists, lexicographers, and editors, it is the most authoritative dictionary of its kind available at any price.

¶ This dictionary contains more than 260,000 carefully selected entries—more than enough to meet almost every conceivable need. Because each of its features is the product of extensive research and scholarship, the *RHD* is exceptionally helpful and easy to use. Here is a partial list of important special features which cannot be found together in any other reference work:

· *Single alphabetical listing of all entries*
· *Major biographical and geographical names*
· *Most common meanings given first*
· *Simple, accurate pronunciation system*
· *More than 2,000 informative pictures and spot maps*
· *Detailed, scholarly etymologies*
· *More than 10,000 synonym lists and studies*
· *Essential usage labels and notes*
· *Thousands of common idiomatic expressions*
· *More than 50,000 example phrases and sentences*
· *New full-color, 64-page atlas of the world*
· *Gazetteer of more than 27,000 place names*
· *Printed in large, readable type*
· *Handsomely bound in long-lasting, washable buckram*
· *Concise dictionaries of French, Spanish, German, Italian*
· *Major dates in world history*
· *Up-to-date directory of colleges and universities*
· *Clear explanations of signs and symbols*

and many other highly useful materials that make this dictionary the most valuable book you can buy today.

# THE RANDOM HOUSE DICTIONARY of the ENGLISH LANGUAGE

**JESS STEIN**
Editor in Chief

**LAURENCE URDANG**
Managing Editor

26345    CONCORDIA COLLEGE LIBRARY
BRONXVILLE, N.Y. 10708



RANDOM HOUSE/NEW YORK

**EXHIBIT B**
The Random House Dictionary of the English Language: Inside Cover.



REF
473
R74

(Dictionary stand)

© Copyright, 1966, by Random House, Inc.

All rights reserved under International and Pan-American Copyright Conventions

PUBLISHED IN NEW YORK BY RANDOM HOUSE, INC.
AND SIMULTANEOUSLY IN TORONTO BY RANDOM HOUSE OF CANADA LIMITED

*Random House Dictionary* and its abbreviations RHD and RHDEL are trademarks of Random House, Inc.

First Printing

Library of Congress Catalog Card Number: 66-21859

Entered words which we have reason to believe constitute trademarks have been designated as such.
However, neither the presence nor the absence of such designation should be regarded as affecting the legal status of any trademark.

*The Concise French Dictionary*, edited by Francesca L. V. Langbaum, © Copyright, 1954, by Random House, Inc.

*The Concise Spanish Dictionary*, edited by Donald F. Solá, © Copyright, 1954, by Random House, Inc.

*The Concise Italian Dictionary*, edited by Robert A. Hall, Jr., © Copyright, 1957, by Random House, Inc.

*The Concise German Dictionary*, edited by Jenni Karding Moulton, © Copyright, 1959, by Random House, Inc.

*Major Dates in History*, edited by Charles D. Lieber and Anne Dyer Murphy, © Copyright, 1964, by Random House, Inc.

Entire contents of the *Atlas* and the index to the maps, © Copyright, 1966, by C. S. Hammond & Company.

*Chart of Periodic Table of the Elements*, © Copyright, 1964, by E. H. Sargent & Co.

*Table of Common Proofreader's Marks*, © Copyright, 1950, 1956, by Alfred A. Knopf, Inc.

Manufactured in the United States of America

# Preface

LANGUAGE is an indispensable instrument of human society. It is the means by which individuals understand each other and are enabled to function together as a community. Indeed, it is unlikely that any human organization could either be formed or long maintained without language. Certainly, in the absence of communication, the complex structure of modern society would be utterly impossible.

The effectiveness of human society, therefore, is largely dependent upon the clarity, accuracy, and efficiency with which language is used or understood. As man's voice reaches now with ease—by radio, by cable, by television—across continents and oceans, the importance of what he says becomes paramount.

But language, unlike such phenomena as breathing and eating, is not biologically inherent; it is not instinctively present. The infant must learn the power and uses of language; he must gain it by conscious effort and by discipline. Sound by sound, word by word, the child acquires this wondrous vehicle for making his wants known, for expressing his feelings and thoughts, for understanding what others wish him to know or do. And, constantly expanding and improving his command of language as he becomes an adult, he develops the capacity for thought and communication on the most abstract and sophisticated planes. Language, as a social convention, thus becomes one of the prime characteristics of man rising above a simple animal existence.

In man's language is to be found the true mirror of man himself. His lexicon is an index to his ideas and passions, his inventions and achievements, his history and hopes. As man extends the horizon of his knowledge, he extends simultaneously the range of his language—devising new words, new meanings, new symbols.

Thus, the remarkable explosion of knowledge in the middle of the twentieth century—the invention of computers and other cybernetic machines, the great new areas of medical discovery, the total revision and expansion of the physical sciences, the exploration of outer space by manned flight and by transmitted signal, and innumerable other developments—has been extensively reflected in our language. Large areas of vocabulary that did not exist until recently—in nuclear physics, in biochemistry, in mathematics, in psychology and sociology, and in dozens of other fields—are now insistently upon the student, the businessman, and the general reader. In every aspect of daily life the necessity for ready access to clear and authoritative information is steadily increasing.

If modern man is to function well in his society, one of his necessities, surely, is to keep pace with the dynamic growth of his language. To meet such a need *The Random House Dictionary of the English Language* has been prepared. It is an entirely new dictionary, written in midcentury for twentieth-century users. Because it is fully up to date and thoroughly reliable, the RHD will provide the user with all the information he is likely to need about meaning, spelling, pronunciation, usage, etymology, and other language matters. As a general

purpose reference book, the RHD meets the requirements of students and laymen and satisfies the quality standards of leading scholars and authorities. The broad sweep of the English language is fully covered here, including foreign words and phrases, biographical terms, geographical terms, abbreviations, titles of major literary works, and many other types of information frequently sought.

In the planning and preparation of this dictionary, we have endeavored to preserve all that is worthy in the great lexicographic traditions of Samuel Johnson, Noah Webster, James A. H. Murray, William Craigie, William Dwight Whitney, and others. We have resisted the temptation to introduce novelty in the guise of innovation, but we have carefully employed those new ideas and methods that represent genuine advances in modern lexicography. This viewpoint has governed us during the twenty years since publication of *The American College Dictionary*, which has been widely praised for its balanced application of linguistics, its lucid use of scholarship, and its unflagging awareness of the importance of communicating with the reader. The *ACD* established a new standard for desk dictionaries, and it is our hope that the RHD will set a new high standard for larger dictionaries.

Throughout our work we have had the advantage of working closely with hundreds upon hundreds of scholars and experts who helped us frame our basic principles, guided us in the myriad decisions that had to be made, and worked directly with us on the manuscript itself. At one stage of our progress, we were also able to confirm the acceptability of our policies by a long questionnaire submitted under unrevealed origin to more than ten thousand teachers, librarians, and writers. In addition, many hundreds of other authorities were consulted on specific questions, and all gave most generously and enthusiastically of their special knowledge and judgment. The comprehensive range represented by our consultants was matched by their wide distribution throughout the United States, England, and other parts around the world.

In the preparation of the RHD, our permanent lexicographic staff made full use of its departmental resources—our large file of citations from newspapers, magazines, and books; glossaries and indexes; special dictionaries and lists; textbooks and concordances; reference books and learned studies, and so on. This was supplemented by extensive use of many major public and university libraries, plus the facilities of many governments, private institutions, and professional organizations.

Our central concern throughout the editing of the RHD has been communication with the user. In the writing of definitions, for example, we have tried to avoid ingeniously concise wordings that are meaningful only to the writer. We have been guided by the premise that a dictionary editor must not only record; he must also teach. We have tried to express ourselves clearly and simply, using normal English and normal punctuation and capitalization. We have often added illustrative examples after definitions in order to give the reader as much help in understanding the meaning and use of the word as reasonably

---

**EXHIBIT B**

The Random House Dictionary of the English Language: Copyright Page.

**leak·age** (lē′kij), *n.* **1.** an act of leaking; leak. **2.** something that leaks in or out. **3.** the amount that leaks in or out. **4.** *Com.* an allowance for loss by leaking. **5.** *Physics, Elect.* the loss of all or part of a useful agent, as of the electric current that flows through an insulator (**leak′age cur′rent**) or of the magnetic flux that passes outside useful flux circuits (**leak′age flux′**). [LEAK + -AGE]

**EXHIBIT B**

The Random House Dictionary of the English Language: Page 815, Zoomed Portion Depicting Definition of "Leakage."

**seep·age** (sē′pij), *n.* **1.** the act or process of seeping; leakage. **2.** something that seeps or leaks out. **3.** a quantity that has seeped out. [SEEP[1] + -AGE]

**EXHIBIT B**

The Random House Dictionary of the English Language: Page 1291, Zoomed Portion Depicting Definition of "Seepage."

**EXHIBIT C**
Federal Bureau of Investigation (FBI) FD-302 Report Documenting Meeting Between Mark
Walsh and the FBI on March 2, 2020, Bates Stamped 12114.

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**


Date of entry     03/11/2020


On 03/02/2020, SA Jeremy Crider and TFO Marshall Varela met with CHS S-77425.  S-77425 identified a water diversion from the Delta Mendota Canal (DMC) at marker 91.71.  The diversion consisted of a large drain pipe that spanned across the canal, but was low enough to be completely submerged in water.  On the south side of the canal the pipe had an approximately 4" section of pipe that was missing, thereby allowing the pipe in either direction to access un-metered water from the DMC.  S77425 noted the diversion has existed for at least 12 years.

S-77425 identified a nearby location on the south side of the canal that was the destination of the diversion pipe.  The location was apparently where a pump had once been operated.  SA Crider and TFO Varela noted exposed wiring that would have been used to power a pump.  The pipe appeared to lead to a nearby ditch, operated by Panoche Water District.  The ditch fed the Hamburg lift pump system.

S-77425 identified field on the north side of the diversion.  Even thought there was no apparent pump pulling from the diversion the elevation gradient of the pipe would always cause some water to flow from the canal into the pipe system in the adjacent field.  Even thought there was no apparent pump, SA Crider and TFO Varela noted several air access pipes that had water flowing away from the canal at a slow rate.  These pipe would eventually flow to an irrigation ditch which could carry the water to multiple destination, including the Hamburg lift system.

SA Crider took photos of the diversion, the south side pump location, south side ditch, Hamburg lift, north side diversion, north side irrigation ditch.  SA Crider also made notations of locations on map printouts.  The photos and map printouts will be attached.


Investigation on   03/02/2020   at  Firebaugh, California, United States (In Person)

File #  194A-SC-6676103, 194A-SC-6676130                      Date drafted   03/10/2020

by  Jeremy Crider

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FALASCHI_00012114

**EXHIBIT D**

Federal Bureau of Investigation (FBI) FD-1032 Report Documenting Phone Call Between Mark Walsh and the FBI On May 26, 2020, Bates Stamped 12157.

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

| **HEADER** |
|---|

| **Source ID:** | S-00077425 |
|---|---|
| **Date:** | 06/01/2020 |
| **Case Agent Name:** | CRIDER, JEREMY J. |
| **Field Office/Division:** | Sacramento |
| **Squad:** | FRA2 |

| **SOURCE REPORTING** |
|---|

| **Date of Contact:** | 05/26/2020 |
|---|---|

**List all present including yourself (do not include the CHS):**
SA Jeremy Crider

| **Type of Contact:** | Telephonic |
|---|---|

| **Date of Report:** | 06/01/2020 |
|---|---|

| **Substantive Case File Number** |
|---|
| 194A-sc-6676130 |

**Check here if additional reporting is in Echo**
No

**Source Reporting:**
CHS reported on the water flow at the water diversions on the Delta Mendota Canal at marker 91.71 and 100.23.

91.71

CHS estimated water was flowing at 20 acre feet a day when being pumped. The pump on the diversion was operational from 2009 to late 2018. Once the pump was removed, in late 2018, the diversion still would have flowed under the force of gravity. CHS estimated the diversion would have been approximately 10 acre feet a day, fed by gravity after the pump was removed.

100.23

CHS estimated water was flowing at 10 acre feet a day fed by gravity. CHS thought the flow could have been higher if a pump was used.

For both diversions, the water level of the Delta Mendota Canal would be too low to feed water into the diversions for approximately two months out of the year. From approximately December through mid January each year the water level in the canal is minimal.

**Synopsis:**
CHS reported on water flow at diversions.

| **SIGNATURE** |
|---|

| Submitted By | **JCRIDER (Crider, Jeremy)** | **Mon, 1 Jun 2020 10:29:16 -07:00** |
|---|---|---|
| First Level Approved By | **lllubbers (Lubbers, Lori)** | **Mon, 1 Jun 2020 13:29:10 -07:00** |

| FD-1023 | Page 1 of 1 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

FALASCHI_00012157

**EXHIBIT E**

Federal Bureau of Investigation (FBI) FD-302 Report Documenting Meeting Between Mark
Walsh and the FBI On April 15, 2020, Bates Stamped 12127.

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry          04/17/2020

On 04/15/2020, SA Jeremy Crider and SA Kathryn Baker met with CHS S-77425.  S-77425 identified a water diversion from the Delta Mendota Canal (DMC) at marker 100.23 that was sealed on 4/13/2020.  The diversion consisted of a 30 inch steel pipe that spanned across the canal, but was low enough to be completely submerged in water.  The pipe had a rupture that was not visible from above the pipe.  The pipe was intended to transfer water between the water irrigation ditches on either side of the canal. S-77425 noted the diversion has existed for several years.  Before the diversion was sealed water was flowing into a ditch operated by Panoche Water District.  The ditch fed into the SJRIP project area.

SA Crider took photos of the where the diversion existed in the canal and the remaining pipe that was presently being stored on the side of the canal.

Investigation on   04/15/2020   at   Firebaugh, California, United States (In Person)

File #   194A-SC-6676103, 194A-SC-6676130                          Date drafted   04/16/2020

by   Jeremy Crider

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.