1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 1:22-CR-00103 JLT SKO |
|---|---|
| Plaintiff, | ORDER DENYING MOTION TO SUPPRESS (Doc. 22) |
| v. | |
| DENNIS FALASCHI, | |
| Defendant. | |

The government alleges that Dennis Falaschi, as the General Manager for Panoche Water District, stole $25,000,000 of water from the Bureau of Reclamation. (Doc. 1 at 1-3) Mr. Falaschi moves the Court to dismiss the indictment, arguing that he was entitled, under the contracts issued by the Bureau, to use of the water because it constituted "seepage." Because the Court finds that the contracts do not address the circumstances alleged by the indictment, the motion is **DENIED**.

I. **Background**

The Panoche Water District ("PWD") is a special district, which supplies water to 38,000 acres of farmland. (Doc. 1 at 1) The defendant in this case, Dennis Falaschi, was the General Manager of the PWD. The PWD purchased the water needed to supply its customers from the Bureau of Reclamation's Central Valley Project ("CVP"). *Id*. at 2. The CVP "takes water from various sources and pumps that water south for delivery through the Delta-Mendota Canal ("DMC") to PWD and

1  other water districts." *Id*. at 2. The DMC is operated by the Bureau of Reclamation. *Id*. The canal is
2  about 117 miles long and runs through Alameda, San Joaquin, Stanislaus, Merced, and Fresno
3  Counties. *Id*. Every year about 2,000,000 acre-feet of water pass through the canal. *Id*. It is an old
4  canal, having been built in the 1950s. *Id*.

5        The water the PWD bought from the Bureau, was supplied through a water meter, that
6  monitored the amount of water delivered. (Doc. 1 at 2) The PWD paid the Bureau a fixed amount per
7  acre-foot. *Id*. The PWD then pumped the water through its own pipelines and canals to its customers at
8  a mark-up or returned excess water to the Bureau for a credit. *Id*. The PWD did not store water,
9  because it had only minimal capacity to do so. *Id*.

10        Around 1992, Mr. Falaschi learned from an employee of the PWD that an old drain turnout
11  "was leaking water from the DMC into a parallel canal that PWD controlled." (Doc. 1 at 3) "The drain
12  was connected to a standpipe on the bank of the DMC . . . The gate inside the standpipe that controlled
13  the water flow between the DMC and PWD's canal had been cemented closed years earlier when the
14  drain was abandoned. The cement had cracked, and water was coming through it. The site was
15  referred to as a "Lift." (Doc. 1 at 3) Because the lift was located near the property belonging to Mike
16  Linneman—the former President of the Board of Directors for PWD—it was referred to as the
17  "Linneman Lift." (*Id*.; Doc. 22 at 5-6)

18        Later in 1992, Falaschi instructed a PWD employee to install a new gate inside the standpipe,
19  so the Linneman Lift "could be opened and closed on demand." (Doc. 1 at 3) He then instructed the
20  same employee to install a locking lid on top of the standpipe and a two-foot elbow pipe off the valve
21  of the standpipe that angled down 90 degrees into the PWD's canal. The lid concealed the theft
22  because it prevented people from seeing that the gate inside the standpipe was functional. "The elbow
23  pipe further concealed and expedited the theft because it enclosed the water flow from the DMC into
24  PWD's canal and was installed in such a way that it was generally submerged under the water." *Id*. at
25  3-4. From 1992 until 2015, periodically, Falaschi instructed various employees to open the gate to
26  remove water from the DMC, without metering, causing the water to flow through a PWD canal and
27  enter a pumping station where it was distributed though PWD's system. *Id*. at 4. Often Falaschi told
28  these employees to open the gate after normal business hours, so that the activity would go unnoticed.

*Id*. Falaschi also told these employees to "include the stolen water volume in daily reports of deliveries to PWD's customers that they submitted to the district's accounting department so that the district could bill the customers and be paid for the water; and to . . . misclassify the water as reclaimed runoff drainage water . . . in monthly reports presented to PWD's Board of Directors." *Id.* at 4-5. In this way, Falaschi was able to account for addition to the district's water supply. *Id*. In total, Falaschi diverted more than 130,000 acre-feet of water—valued at $25,000,000—from the Bureau. *Id*. at 5. Falschi used the money to benefit himself and others involved in the theft. *Id*.

In his motion to dismiss, Mr. Falaschi argues that the indictment should be dismissed because his acts were authorized by contracts issued by the Bureau to PWD, which allowed PWD the benefit of water "seepages." (Doc. 22) The contract executed in 1954 and 1974 reads,

> The United States shall not be responsible for the control, carriage, handling, use, disposal, or distribution of water which may be furnished at the delivery points established pursuant to (a) of this article, nor for claim of damage of any nature whatsoever, including but not limited to property damage, personal injury or death, arising out of or connected with the control, carriage, handling, use, disposal or distribution of such water beyond such delivery point: Provided, **That the United States reserves the right to all waste, seepage, and return flow water derived from water <u>furnished</u> to the District hereunder and which escapes or is discharged beyond the District's boundaries** and nothing herein shall be construed as an abandonment or a relinquishment by the United States of any such water, **but this shall not be construed as claiming for the United States any right, as waste, seepage, or return flow, to water being used pursuant to this contract for surface irrigation or underground storage within the District's boundaries** by the District or those claiming by, through, or under the District.

(Doc. 22-7 at 12; Doc. 22-8 at 22, emphasis added) The 2009 contract provides,

> **The United States reserves the right to all seepage and return flow water derived from Water <u>Delivered</u> to the Contractor hereunder which escapes or is discharged beyond the Contractor's Service Area**; Provided, **That this shall not be construed as claiming for the United States any right to seepage or return flow being put to reasonable and beneficial use pursuant to this Contract within the Contractor's Service Area by the Contractor** or those claiming by, through, or under the Contractor.

(Doc. 22-9 at 34, emphasis added) All of the contracts preclude PWD from taking water except at delivery points agreed upon in writing. (Doc. 22-7 at 11; Doc. 22-8 at 21; Doc. 22-9 at 22) All water delivered according to the contract, was required to be measured. *Id*. In the 1954 and 1974 contracts, the government had the burden of measuring the water delivered. *Id*. Under the 2009 contract, PWD was required to accurately measure the water. (Doc. 22-9 at 22)

3

## II. Analysis

### A. Motion under 12(b)(1)

Mr. Falschi brings his motion under Federal Rules of Criminal Procedure 12(b)(1), which allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Despite what appears to be expansive language, a Rule 12(b) motion is confined to limited circumstances. In general, "Rule 12(b) motions are appropriate to consider "such matters as former jeopardy, former conviction, former acquittal, statute of limitations, immunity, [and] lack of jurisdiction." *United States v. Nukida,* 8 F.3d 665, 669 (9th Cir. 1993), quoting *United States v. Smith*, 866 F.2d 1092, 1096 n. 3 (9th Cir.1989). "A pretrial motion is generally 'capable of determination' before trial if it involves questions of law rather than fact. *United States v. Shortt Acct. Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986). The Court can make factual determinations when the facts to be determined "would be of no assistance" to the jury in determining the defendant's guilt, and the evidence is "'entirely segregable' from the evidence to be presented at trial." *Id*.

For example, in *United States v. Plummer*, 941 F.2d 799, 802 (9th Cir. 1991), the court considered whether the trial court properly denied a motion to dismiss an indictment based upon its interpretation of an informal immunity agreement. The Court observed, "The district court's interpretation of the agreement between Mr. Plummer and the government, and whether that agreement was violated, determined whether the motion to dismiss the indictment would be granted or denied. Therefore, the standard of review of the district court's denial of the motion is the same as in civil contract cases. *Id*. at 802-803. Though the Court ultimately disagreed with the trial court's determination that the contract was not ambiguous, it did not find that this determination was beyond the trial court's authority. However, unlike here, the determination before the court was not whether the defendant had a defense to the charged crime but whether, even if he committed the acts, he could be prosecuted in light of the immunity agreement.

The question presented here is not whether the indictment is facially sufficient. (Doc. 27 at 4, n. 4) Instead, Mr. Falsachi argues that the contract between PWD and the government authorized him to take the action that he did and, therefore, the indictment should be dismissed.

4

The government contends that when evaluating the motion, the Court is bound by the four corners of the indictment. The government contends that at issue in Mr. Falaschi's motion is a factual dispute as to the meaning and applicability of the contracts and that such disputes are reserved to trial. Both sides are correct. Thus, the Court agrees that it *cannot* make a factual determination and agrees that it *can* determine whether the contracts are ambiguous. *Carpenters Pension Trust Fund v. Underground Constr. Co.*, 31 F.3d 776, 778 (9th Cir.1994). However, the Court does not find that the question of whether the contract is ambiguous is ripe.

Mr. Falaschi contends that the contract between PWD and the Bureau allowed PWD to make beneficial use of water seeping from the DMC.[1] (Doc. 22 at 7-8, 9-10) However, at issue in the indictment is not a leak from the canal, even though that seems to be what caused Mr. Falaschi to devise the method by which he could withdraw water from the DMC. Instead, at issue are the allegations that Falaschi had a new gate installed at the Linneman Lift and installed the new two-foot elbow below the water level in PWD's canal. Put together, along with the locked lid on the standpipe, this enabled Falaschi to take water from the DMC without paying for it, while avoiding detection. Despite Mr. Falaschi's claims in his motion, the allegations of the indictment do not suggest that Mr. Falaschi's conduct related to taking beneficial use of seeping water that had been furnished/delivered to the PWD.[2]  Thus, Mr. Falaschi has not made the required showing that the contract applies to the situation at hand. Consequently, the Court declines to determine at this time whether the provisions of the contracts are ambiguous because, even if it made this determination, this would not support that the indictment should be dismissed. The motion to dismiss the indictment is **DENIED**.

IT IS SO ORDERED.

Dated:   **February 28, 2023**

UNITED STATES DISTRICT JUDGE

---

[1] Though the Court does not decide the meaning of the contract here, it is notable that the contracts reserve to the Bureau any water that seeps from the water that has been *furnished/delivered* to the PWD and which escapes or is discharged *beyond* PWD's service area. It disclaims in favor of PWD, that which seeps from the water that was *furnished/delivered* to PWD and which escapes or is discharged *within* PWD's service area.

[2] The suggestion that he was entitled to take water as allege because he corrected the leak by installing the new gate and because PWD lacked storage capacity, is not presented on the face of the indictment. The Court does not decide this but has strong doubts the contract's terms allowed this.

5